## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| C.K., an individual;<br><br>Plaintiff<br><br>-against-<br><br>WYNDHAM HOTELS AND RESORTS, INC.;<br><br>HILTON WORLDWIDE HOLDINGS, INC;<br><br>MARRIOTT INTERNATIONAL, INC.;<br><br>INTER-CONTINENTAL HOTELS, CORPORATION;<br><br>AND HYATT HOTELS CORPORATION,<br><br>Defendants. | CIVIL ACTION NO :PLEADING TITLE<br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

COMES NOW the Plaintiff C.K., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation, know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt

1

Hotels Corporation, have instead chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

3.     This action for damages is brought by the Plaintiff (hereinafter identified by her initials "C.K."), a survivor of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA") and Fla. Stat. § 772.104.

4.     C.K. met her trafficker in Jacksonville, Florida at the end of 2008. She was 19 years old and believed she was interviewing for a part-time job answering the phones for a computer company. Instead, C.K. was required to sexually service paying strangers while enduring brutal physical assaults, psychological torment, verbal abuse, and imprisonment at the Defendants' hotels for three (3) years as the Defendants profited.

5.     The Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.     C.K. was advertised on Backpage.com, tortured, and exploited at hotels in Jacksonville, Florida, including the Homewood Suites®, Hampton Inn®, Howard Johnson®, Microtel®, the Crowne Plaza®, the Hyatt Regency®, the Embassy Suites®, the Sheraton®, and the Four Points® by Sheraton.

7.     As a direct and proximate result of Defendants' consistent refusals to prevent human trafficking on their hotel properties, C.K. was sex trafficked, sexually exploited, and victimized repeatedly at Wyndham Worldwide Operations, Hilton Worldwide Holdings, Hyatt Hotels Corporation, Intercontinental Hotels Group, and Starwood Hotels and Resorts Worldwide brand hotels.

8.     The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which C.K. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

**PARTIES**

9.    The Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials C.K., was 19 years old when she was first sold for sex and trafficked throughout Florida for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).   The Plaintiff currently resides in Ostego County, New York.

10.    Defendant Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") is another of the world's largest hotel companies and offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Parsippany, New Jersey and can be served by its registered agent Corporate Creations Network Inc., 3411 Silverside Road, Suite 104, Wilmington, Delaware and can be served by its registered agent Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building Ste 104, Wilmington, Delaware, 19810.

        a.    Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of the predecessor.

        b.    Howard Johnson® and Microtel® brand hotels are Wyndham hotels.

        c.    As a hotel operator, Defendant Wyndham controls the training and policies for its hotels including the Howard Johnson® and Microtel® hotels where C.K. was trafficked.

        d.    Defendant Wyndham maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.[2]

---

[1] Contemporaneously with the Complaint, Plaintiff C.K. filed, pursuant to a Motion to Permit Plaintiff to Proceed Anonymously as C.K. based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.

[2] Wyndham Hotels and Resorts, 2019 Social Responsibility Report: Protecting Our Human Rights (p.30) available at https://corporate.wyndhamhotels.com/wp-content/uploads/2019/07/Wyndham-GRI-2019-Final_web.pdf (last visited Nov. 20, 2019).

e.  By and through its relationship with the staff at the Howard Johnson® and Microtel® hotels where C.K. was trafficked and the hotel guest perpetrator who trafficked her at a Howard Johnson® and Microtel® hotels, Defendant Wyndham knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

f.  Wyndham receives a percentage of the gross room revenue from the money generated by the operations of all Howard Johnson® and Microtel® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

g.  At all relevant times, Wyndham owned, supervised, and/or operated the Howard Johnson® at 4300 Salisbury Road in Jacksonville, Florida under its Howard Johnson® brand.

h.  At all relevant times, Wyndham owns, supervises, and/or operates the Microtel® at 4940 Mustang Road in Jacksonville, Florida under its Microtel® by Wyndham brand.

i.  Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Florida, operates dozens of in Florida, contracts to supply services in Florida, caused indivisible injuries to the Plaintiff in Florida, and profited from an illegal sex trafficking venture at the Howard Johnson® at 4300 Salisbury Road in Jacksonville, Florida and the Microtel® at 4940 Mustang Road in Jacksonville, Florida.

11. Defendant Hilton Worldwide Holdings, Inc. (hereinafter "Hilton") is one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation headquartered with its with its principal place of business located at 7930 Jones Branch Drive in McLean, Virginia and can be served by its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808.

a.  Embassy Suites®, Homewood Suites®, and Hampton Inn® hotels are Hilton hotels.

4

b.  As a hotel operator, Defendant Hilton controls the training and policies for its hotels including the Embassy Suites®, Homewood Suites®, and Hampton Inn® hotels where C.K. was trafficked.

c.  Defendant Hilton maintains that it considers guest safety and security important and requires the hotels in its portfolio to comply with Hilton brand standards and all local, state, and federal laws.[3]

d.  Through its relationship with the staff at the Embassy Suites®, Homewood Suites®, and Hampton Inn® hotels where C.K. was trafficked and the hotel guest perpetrator who trafficked C.K. at the Embassy Suites®, Homewood Suites®, and Hampton Inn® hotels, Defendant Hilton knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

e.  Hilton receives a percentage of the gross room revenue from the money generated by the operations of all Embassy Suites®, Homewood Suites®, and Hampton Inn® hotels, including a percentage of the rate charged on the rate charged for the rooms in which the Plaintiff was trafficked.

f.  Hilton owns, supervises, and/or operates the Embassy Suites® Jacksonville Baymeadows at 9300 Baymeadows Road in Jacksonville, Florida.

g.  Hilton owns, supervises, and/or operates the Homewood Suites® Jacksonville South/St. John's Center at 10434 Mid Town Parkway in Jacksonville, Florida.

h.  Hilton owns, supervises, and/or operates the Hampton Inn® Jacksonville South at 4681 Lenoir Ave S. in Jacksonville, Florida.

i.  Hilton is subject to the jurisdiction of this Court because it regularly transacts business in Florida, operates dozens of hotels in Florida including the Embassy Suites®,

---

[3] Marriott International Inc., Human Rights Policy Statement (July 2017) available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

Homewood Suites®, and Hampton Inn® contracts to supply services in Florida, caused indivisible injuries to the Plaintiff in Florida, and knowingly profited from an illegal sex trafficking venture at the Embassy Suites®  Jacksonville Baymeadows at 9300 Baymeadows Road in Jacksonville, Florida, the Homewood Suites® Jacksonville South/St. John's Center at 10434 Mid Town Parkway in Jacksonville, Florida, and the Hampton Inn® Jacksonville South at 4681 Lenoir Ave S. in Jacksonville, Florida.

12. Defendant Marriott International, Inc. (hereinafter "Marriott") is one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation headquartered with its headquarters located at 10400 Fernwood Road in Bethesda, Maryland and can be served by its registered agent, Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

   a.   Defendant Marriott International, Inc. is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

   b.   As of 2016, Starwood Hotels and Resorts, LLC is a wholly owned subsidiary of Marriott International, Inc.

   c.   Four Points® by Sheraton brand hotels are Marriott hotels.

   d.   As a hotel operator, Defendant Marriott controls the training and policies for its hotels including the Four Points® hotel where C.K. was trafficked.

   e.   Defendant Marriott maintains that it considers guest safety and security important and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[4]

   f.   Through its relationship with the staff at the Four Points® where C.K. was trafficked and the hotel guest perpetrator who trafficked C.K. at the Four Points® hotels,

---

[4] Marriott International Inc., Human Rights Policy Statement (July 2017) available at
https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

Defendant Marriott knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

g. Marriott receives a percentage of the gross room revenue from the money generated by the operations of all Four Points® hotels, including a percentage of the rate charged on the rate charged for the rooms in which the Plaintiff was trafficked.

h. Marriott owns, supervises, and/or operates the Four Points® Jacksonville Baymeadows at 8520 Baymeadows Road in Jacksonville, Florida.

i. Marriott owns, supervises, and/or operates the Four Points® Jacksonville at 10605 Deerwood Park Boulevard in Jacksonville, Florida.

j. Marriott is subject to the jurisdiction of this Court because it regularly transacts business in Florida, operates dozens of hotels in Florida including the Four Points® contracts to supply services in Florida, caused indivisible injuries to the Plaintiff in Florida, and knowingly profited from an illegal sex trafficking venture at the Four Points® at 8520 Baymeadows Road in Jacksonville, Florida and the Four Points® at 10605 Deerwood Park Boulevard in Jacksonville, Florida.

13. Defendant Inter-Continental Hotels Corporation (hereinafter "IHG") is one of the largest hotel brands in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its regional headquarters in Atlanta, Georgia and can be served by its registered agent Corporation Service Company, 1201 Hays Street, Tallahassee, FL, 32301.

a. Crowne Plaza® brand hotels are IHG hotels.

b. As a hotel operator, Defendant IHG controls the training and policies for its branded properties including the Crowne Plaza® where C.K. was trafficked. Defendant IHG

represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with IHG brand standards and all local, state, and federal laws.[5]

c.   Through its relationship with the staff at the Crowne Plaza® where C.K. was trafficked and the hotel guest perpetrator who trafficked C.K. at a Crowne Plaza® hotel, Defendant IHG knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

d.   IHG receives a percentage of the gross room revenue from the money generated by the operations of Crowne Plaza® including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which the Plaintiff was sex trafficked.

e.   At all relevant times, IHG owned, supervised, and/or operated the Crowne Plaza® Jacksonville Riverfront at 1201 River Place Boulevard in Jacksonville, Florida.

f.   IHG is subject to the jurisdiction of this Court because it regularly transacts business in Florida, operates dozens of hotels in Florida, contracts to supply services in Florida, caused indivisible injuries to the Plaintiff in Florida, and knowingly profited from an illegal sex trafficking venture at the Crowne Plaza® Jacksonville Riverfront at 1201 River Place Boulevard in Jacksonville, Florida.

14.  Defendant Hyatt Corporation (hereinafter "Hyatt") is one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation headquartered in Chicago, Illinois and can be served by its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808.

a.   Hyatt Regency® is a Hyatt brand property.

---

[5] Inter-Continental Hotels Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019)

b.  As a hotel operator, Defendant Hyatt controls the training and policies for its branded properties including the Hyatt Regency® hotel where C.K. was trafficked. Defendant Hyatt represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Hyatt brand standards and all local, state, and federal laws.[6]

c.  By and through its relationship with the staff at the Hyatt Regency® where C.K. was trafficked and the perpetrator who trafficked C.K. at the Hyatt Regency® while registered as a guest there, Defendant Hyatt knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

d.  Hyatt receives a percentage of the gross room revenue from the money generated by the operations of Hyatt Regency® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

e.  Hyatt owns, supervises, and/or operates the Hyatt Regency® Jacksonville Riverfront at 225 E Coastline Drive in Jacksonville, Florida.

f.  Hyatt is subject to the jurisdiction of this Court because it regularly transacts business in Florida, operates dozens of hotels in Florida, including the Hyatt Regency® at 225 E Coastline Drive in Jacksonville, Florida, contracts to supply services in Florida, caused indivisible injuries to the Plaintiff in Florida, and profited from an illegal sex trafficking venture at the Hyatt Regency® at 225 E Coastline Drive in Jacksonville, Florida.

15.  Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

---

[6] *About Hyatt: Corporate Responsibility – Human Rights*, https://about.hyatt.com/en/hyatt-thrive/human-rights.html (last visited Nov. 20, 2019).

**JURISDICTION AND VENUE**

16.   This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

17.   Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

**SEX TRAFFICKING UNDER FEDERAL LAW**

18.   Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

19.   To better understand the mechanism by which sex trafficking is prohibited by federal criminal law, it is best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

20.   Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

10

21.    Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a minimum, ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[7]

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-  The Polaris Project [8]*

22.    Human trafficking is the world's fastest growing crime.[9]  While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[10]

23.    Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

24.    The hospitality industry plays a crucial role in the sex trade.[11]   The trope of the "no-tell, motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

---

[7] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.
[8] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[9] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[10] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[11] Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, Cornell University School of Hotel Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

25. According to National Human Trafficking Hotline statistics, hotels are the top reported venue, even over commercial front brothels, where sex trafficking acts occur.[12]  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

26. Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an 'in call'.

27. Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[13]

28. The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[14]

29. Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[15]  Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

30. Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

---

[12] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[13] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[14] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[15] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

31. But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from dangers that were known or should have been known, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[16]

32.  Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal, not to mention moral, obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[17]

33.  From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

34.  Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[18]

---

[16] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[17] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[18] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

35. Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[19] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

36. Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[20]

37. In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

38. The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

39.    In 2011, Wyndham trained only some of its employees to look for signs of trafficking.[21]

40.    In 2012, an anti-trafficking coalition alerted Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[22]

41.    Marriott International claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [23]

---

[19] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[20] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[21] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[22] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).
[23] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

42.     In 2013, IHG commissioned an external assessment of human rights risks most relevant for the travel and hospitality sector globally and regionally working with external human rights experts, Maplecroft. The risks identified included human trafficking.[24]

43.     In 2015 and 2016 IHG identified the modern slavery risks most relevant to IHG across four different areas of risk: (I) risks of modern slavery affecting their organization including IHG hotels, (ii) risks of modern slavery occurring in IHG corporate or hotel supply chains, (iii) risks of modern slavery such as human trafficking occurring in or around IHG branded hotels, (iv) risks of modern slavery occurring at different stages of the hotel lifecycle.   IHG represents that its various risk assessment mechanisms have helped them to identify higher risk locations since 2013.[25]

44.     In 2016, Starwood Hotels and Resorts, Inc. first updated its 2007 Human Rights Policy to include language and attention specific to sex trafficking.[26]

45.     Choice Hotels has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[27]

46.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[28]   These efforts sought to educate both the public and private sectors on identifying and

---

[24] Inter-Continental Hotel Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C9DF02ABC227 (last visited Nov. 22, 2019).
[25] *Id.*
[26] Promoting Human Rights is Part of Starwood's Strategy, September 21, 2016, Hotel Business, https://togo.hotelbusiness.com/article/promoting-human-rights-is-part-of-starwoods-strategy/ (last visited Dec.8, 2019).
[27] *Human Rights Policy*, Choice Hotels, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).
[28] *DHS Blue Campaign Five Year Milestone*, Department of Homeland Security (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[29]

47. Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

## B.  THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

48.    Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by the franchisee or a third party management company under the brands' control. In return, the parent brand then gets to exchange the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning only a contract or franchise agreement and still profit from putting heads in beds.

49. The average consumer does not see this relationship.  The parent brand gives the franchisee property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

50. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-

---

[29] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent brand.[30]

51. The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

52. Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate.  The right of the parent hotel brand to enforce their brand standards is also their responsibility.

53.  At the time of the incidents alleged herein:

   a.   Defendant Wyndham Hotels and Resorts, Inc., owned and controlled the Microtel® and Howard Johnson® brands.

   b.  Defendant Hilton Worldwide Holdings, Inc. owned and controlled the Hampton Inn®, Homewood Suites®, and Embassy Suites® brands.

   c.  Defendant Marriott International, Inc., f/k/a Starwood Hotels and Resorts Worldwide, Inc. owned and controlled the Sheraton® and Four Points® – by Sheraton brand.

   d.  Defendant Inter-Continental Hotels Corporation owned and controlled the Crowne Plaza® brand.

   e.  Defendant Hyatt Hotels Corporation owned and controlled the Hyatt Regency® brand.

54.  Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments so it is seldom done.

### C.  THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

55.  Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation have been on notice of repeated

---

[30] Ellen Meyer, <u>The Origins and Growth of Franchising in the Hotel Industry</u>, Lodging Magazine (April 10, 2018)
https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/

incidences of sex trafficking occurring at their Howard Johnson®, Microtel®, Four Points® by Sheraton, Sheraton®, Hampton Inn®, Homewood Suites®, Embassy Suites®, Hyatt Regency® and Crown Plaza® hotels yet the brand managers failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

56.   WYNDHAM HOTELS AND RESORTS, INC ("WYNDHAM")

    a.   HOWARD JOHNSON®

        i.   Defendant Wyndham owns, supervises, and/or operates the Howard Johnson® at 4300 Salisbury Road in Jacksonville, Florida.

        ii.   Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

        iii.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

        iv.   Defendant Wyndham may exercise control over Howard Johnson® hotels by:

            1.   distributing information to assist employees in identifying human trafficking;

            2.   providing a process for escalating human trafficking concerns within the organization;

            3.   requiring employees to attend training related to human trafficking;

            4.   providing new hire orientation on human rights and corporate responsibility;

            5.   providing training and education to Howard Johnson® hotels through webinars, seminars, conferences, and online portals;

            6.   developing and holding ongoing training sessions on human trafficking; or

7. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v. Wyndham was in an actual or apparent agency relationship with Fairfield Inn® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Howard Johnson® hotels by Defendant Wyndham's operations, including the means and methods of how Fairfield Inn® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant Wyndham's domain;

2. requiring Howard Johnson® hotels to use Defendant Wyndham's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Howard Johnson® hotels of independence in business operations.

vi. An actual and/or apparent agency also exists between Defendant Wyndham and Howard Johnson® hotels. Defendant Wyndham held out Howard Johnson® hotels to the public as possessing authority to act on its behalf.

19

vii.   Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Howard Johnson® hotels, Defendant Wyndham breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii.  For years, Defendant Wyndham has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Fairfield Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Fairfield Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Fairfield Inn® hotels that forms

the basis of this complaint.

1.  In October 2017, the manager of a Howard Johnson® in Bartonville, Pennsylvania was federally indicted for allowing and profiting from drug and sex trafficking within the hotel.[31]

2.  In August 2017, a Boston woman who had already been indicted for running a number of brothels was caught trafficking women for commercial sex out of a Howard Johnson® in Quincy, Massachusetts.[32]

3.  In December 2015, a woman was charged with sex trafficking two teenage girls out of a Howard Johnson® in Billings, Montana.[33]

4.  In October 2018, a man was arraigned on charges of human trafficking for the forceful prostitution of a woman out of a Harrisburg, Pennsylvania Howard Johnson®.[34]

5.  In February 2013, the city of San Diego ordered a Mission Valley Howard Johnson® to crackdown on the commercial sex trade at its hotel by adding a 24-hour security guard, installing more security cameras, and posting signs warning of criminal activity, after San Diego police made 18 prostitution-related arrests there in less than one year.[35]

6.  In January 2014, a couple was charged with forcing a 26-year old North Carolina woman to prostitute at a Howard Johnson® in Blackwood, New Jersey.[36]

7.  June 2015, a man was arrested for selling prostituting a 15-year old at a

[31] https://www.pahomepage.com/news/bartonsville-hotel-operator-charged-with-human-drug-trafficking/845318319
[32] https://www.patriotledger.com/news/20170808/alleged-quincy-brothel-owner-arrested-again-for-sex-trafficking
[33] https://billingsgazette.com/news/state-and-regional/crime-and-courts/woman-charged-with-promoting--year-old-for-prostitution-held/article_e37c47fa-1d9f-5a25-8448-fc005ca1b936.html
[34] https://www.abc27.com/news/local/man-charged-with-human-trafficking-waives-charges/1520032446
[35] https://www.nbcsandiego.com/news/local/Howard-Johnson-Hotel-Prostitution-Mission-Valley-San-Diego-193895621.html
[36] https://www.nj.com/camden/index.ssf/2015/06/headache_hotel_nj_police_department_battles_guns_d.html

Howard Johnson® in New Brunswick, New Jersey.[37]

8. In January 2015, a man was convicted of victimizing two (2) teenage girls in a sex trafficking operation at a Howard Johnson® in Milford, Connecticut. A 16-year-old girl was rescued after being found unconscious in the hotel room.[38]

9. In May 2017, a couple and a third party were charged with federal charges of conspiracy, commercial sex trafficking and commercial sex trafficking of a minor after one of the women they prostituted was found dead in a public park. It was discovered during the investigation that the couple threatened to kill the woman if she didn't work for them and that they kept her locked in a dog crate at the Howard Johnson® in Albuquerque, New Mexico.[39]

b. MICROTEL® BY WYNDHAM

i. At all relevant times, Defendant Wyndham owned, supervised, and/or operated the Microtel® at 4940 Mustang Road in Jacksonville, Florida.

ii. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

iii. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

iv. Defendant Wyndham may exercise control over Microtel® hotels by:

1. distributing information to assist employees in identifying human trafficking;

---

[37] https://www.nj.com/union/index.ssf/2015/12/plainfield_man_who_recruited_girl_for_prostitution.html
[38] https://www.nhregister.com/connecticut/article/Man-convicted-of-sex-trafficking-underage-girls-11353403.php
[39] https://www.abqjournal.com/1006066/feds-3-abq-residents-ran-sex-trafficking-ring-tied-to-2-murders.html

2. providing a process for escalating human trafficking concerns within the organization;

3. requiring employees to attend training related to human trafficking;

4. providing new hire orientation on human rights and corporate responsibility;

5. providing training and education to Microtel® hotels through webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking; or

7. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v. Wyndham was in an actual or apparent agency relationship with Microtel® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Microtel® hotels by Defendant Wyndham's operations, including the means and methods of how Microtel® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant Wyndham's domain;

2. requiring Microtel® hotels to use Defendant Wyndham's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

23

8.  building and maintaining the facility in a manner specified by the owner;

9.  standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Microtel® hotels of independence in business operations.

vi.  An actual and/or apparent agency also exists between Defendant Wyndham and Microtel® by Wyndham hotels. Defendant Wyndham held out Microtel® hotels to the public as possessing authority to act on its behalf.

vii. Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Microtel® hotels, Defendant Wyndham breached its duties in the following ways:

1.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5.  Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6.  Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

24

7.  Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii. For years, Defendant Wyndham has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Microtel® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Microtel® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Microtel® hotels that forms the basis of this complaint.

1.  In January 2018, a married couple was arrested and indicted for trafficking dozens of Chinese women for prostitution and pimping them out of the Microtel® in Dover, Maine. The couple deprived the women of documents, food, clothing, room keys and other things to ensure they were unable to leave the locations.[40]

2.  In December 2011, a prostituted woman was sexually assaulted by a man posing as a police officer at a Microtel® in Baltimore, Maryland. The man then tried to pull the same routine on a different woman at the same hotel two days later.[41]

3.  In June 2018, a teenage girl was rescued from a Microtel® in Raleigh, North Carolina where she was being held in sexual servitude by a 23-year old man who profited from prostituting her.[42]

4.  In October 2017, a 16-year-old girl was rescued from a Microtel® in

---

[40] https://patch.com/new-hampshire/concord-nh/concord-couple-accused-sex-ring-jailed-indefinitely
[41] http://www.capitalgazette.com/cg2-arc-7af4f1d7-242e-5c7e-8130-e0608eb7168f-20120512-story.html
[42] https://www.cbs17.com/news/local-news/wake-county-news/wake-county-man-forced-minor-into-sexual-slavery-warrants-say/1224375262

Raleigh, North Carolina where she was being held by a man who was prostituting her from the location. The man was a known sex trafficker.[43]

5. In February 2018, two pimps were arrested during an undercover sex trafficking sting at a Microtel® in Conway, Arkansas.[44]

6. In January 2013, two men were convicted of sex trafficking two teenage girls at a Microtel® in Eagan, Minnesota.[45]

7. In June 2013, a man was arrested at a Microtel® in Greenville, North Carolina for the human trafficking and sexual servitude of a teenage girl at the location.[46]

8. In March 2013, a brother and sister were arrested for sex trafficking at a Microtel® in Mankato, Wisconsin.  One of the victims interviewed by police described being abused by the pair for years, including being beaten with a belt, tortured with a stun gun, and burned repeatedly with cigarettes.  She also said she had attempted to escape in the past but was caught and severely beaten by the pair.[47]

9. In January 2013, a man was criminally charged for sex trafficking three women at a Microtel® in Chattanooga, Tennessee.[48]

57. MARRIOTT INTERNATIONAL, INC. ("MARRIOTT")

   a. FOUR POINTS® BY SHERATON

      i. Defendant Marriott by and through its wholly owned subsidiary owns, supervises, and/or operates the Four Points® by Sheraton Jacksonville Baymeadows at 8520 Baymeadows Road in Jacksonville, Florida.

---

[43] https://www.newsobserver.com/news/local/crime/article178431461.html
[44] https://www.thecabin.net/news/20180226/conway-men-facing-felony-charges-after-fleeing-officers-during-prostitution-sting
[45] https://www.twincities.com/2013/04/25/st-paul-man-gets-10-years-for-prostitution-of-girls-at-eagan-hotel/
[46] https://www.witn.com/home/headlines/Man-Charged-With-Human-Trafficking-In-Pitt-County-213318591.html
[47] http://www.mankatofreepress.com/news/local_news/brother-sister-charged-with-sex-trafficking/article_091fbf10-0bcc-5e82-b58d-76ae4879f3ef.html
[48] https://www.chattanoogan.com/2013/1/23/242781/Atlanta-Man-Charged-In-Chattanooga-With.aspx

ii.  Defendant Marriott by and through its wholly owned subsidiary also owns, supervises, and/or operates the Four Points® Jacksonville at 10605 Deerwood Park Boulevard in Jacksonville, Florida.

iii.  Marriott failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

iv.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Marriott has repeatedly failed to stop these actions.

v.  Defendant Marriott may exercise control over Four Points® hotels by:

    1.  distributing information to assist employees in identifying human trafficking;

    2.  providing a process for escalating human trafficking concerns within the organization;

    3.  requiring employees to attend training related to human trafficking;

    4.  providing new hire orientation on human rights and corporate responsibility;

    5.  providing training and education to Four Points® hotels through webinars, seminars, conferences, and online portals;

    6.  developing and holding ongoing training sessions on human trafficking; or

    7.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

vi.  Marriott was in an actual or apparent agency relationship with Four Points® by Sheraton hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Marriott's exercise of an ongoing

and systemic right of control over Four Points® by Sheraton hotels by Defendant Marriott's operations, including the means and methods of how Fairfield Inn® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant Marriott's domain;

2. requiring Four Points® by Sheraton hotels to use Defendant Marriott's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Four Points® hotels of independence in business operations.

vii. An actual and/or apparent agency also exists between Defendant Marriott and Four Points® by Sheraton hotels. Defendant Marriott held out Four Points® hotels to the public as possessing authority to act on its behalf.

viii. Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Four Points® by Sheraton hotels, Defendant Marriott breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

ix. For years, Defendant Marriott has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Four Points® by Sheraton hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Four Points® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Four Points® hotels that forms the basis of this complaint.

1. In December of 2014, a man was charged with human trafficking after holding a woman and her toddler hostage at the Four Points® by Sheraton in San Rafael, California. The man held the woman in the hotel against her will and pimped her out while he watched her 2-year-old

29

toddler.[49]

2.  In December of 2014, a traffic stop led to the discovery of a 16-year-old girl who was being sold for sex by a woman at a Four Points® by Sheraton in San Rafael, California.[50]

3.  In August of 2018, a survivor described to the San Francisco Chronicle how her sex trafficking experience started with her being trafficked out of a Four Points® by Sheraton in Emeryville, California. When she attempted to escape, she was re-captured by her pimp and thrown in the trunk of a car.[51]

58.  HILTON WORLDWIDE HOLDINGS, INC. ("HILTON")

a.  HAMPTON INN®

i.  Defendant Hilton owns, supervises, and/or operates the Hampton Inn® – Jacksonville South located at 4681 Lenoir Ave S. in Jacksonville, Florida.

ii.  Hilton failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

iii.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hilton has repeatedly failed to stop these actions.

iv.  Defendant Hilton may exercise control over Hampton Inn® hotels by:

1.  distributing information to assist employees in identifying human trafficking;

2.  providing a process for escalating human trafficking concerns within the organization;

3.  requiring employees to attend training related to human trafficking;

---

[49] https://www.times-standard.com/2014/12/08/hayward-man-arrested-for-alleged-human-trafficking-in-marin-hotel/
[50] https://www.chicoer.com/2014/12/24/police-woman-pimped-16-year-old-girl-at-marin-hotel/
[51] https://www.sfchronicle.com/crime/article/Sex-worker-s-murder-case-testimony-gives-rare-13192240.php

4.  providing new hire orientation on human rights and corporate responsibility;

5.  providing training and education to Hampton Inn® hotels through webinars, seminars, conferences, and online portals;

6.  developing and holding ongoing training sessions on human trafficking; or

7.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v.  Hilton was in an actual or apparent agency relationship with Hampton Inn® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Hilton's exercise of an ongoing and systemic right of control over Hampton Inn® hotels by Defendant Hilton's operations, including the means and methods of how Hampton Inn® hotels conducted daily business through one or more of the following actions:

1.  hosting online bookings on Defendant Hilton's domain;

2.  requiring Hampton Inn® hotels to use Defendant Hilton's customer rewards program;

3.  setting employee wages;

4.  making employment decisions;

5.  advertising for employment;

6.  sharing profits;

7.  standardized training methods for employees;

8.  building and maintaining the facility in a manner specified by the owner;

9.  standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

      11. fixing prices; or

      12. other actions that deprive Hampton Inn® hotels of independence in business operations.

vi. An actual and/or apparent agency also exists between Defendant Hilton and Hampton Inn® hotels. Defendant Hilton held out Hampton Inn® hotels to the public as possessing authority to act on its behalf.

vii. Given Defendant Hilton's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Hampton Inn® hotels, Defendant Hilton breached its duties in the following ways:

      1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

      2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

      3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

      4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

      5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

      6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

      7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking

performance indicators and key metrics on human trafficking prevention.

viii. For years, Defendant Hilton has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Hampton Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Hampton Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Hampton Inn® hotels that forms the basis of this complaint.

1. In May 2018, 2 men were indicted for luring a woman from California to Philadelphia, and forcing her into prostitution. The men advertised the victim on backpage.com without her permission, and forced her to service demanding buyers at the Hampton Inn® in Philadelphia, Pennsylvania.[52]

2. In January 2017, a man was charged with human trafficking after he prostituted 2 women out of a Hampton Inn® in West Melbourne, Florida. The man had told the women that they were never going home, and that if they did he would kill them.[53]

3. In January 2016, a man was sentenced to 10 years in prison after sex trafficking young women at a Hampton Inn® in Braintree, Massachusetts.[54]

4. In April 2018, a school district superintendent was charged with attempted sex trafficking after he paid 2 underage girls for sex at a Hampton Inn® in Richland, Washington.[55]

---

[52] https://www.dailylocal.com/news/feds-indict-in-sex-trafficking-case/article_652194f5-807b-57ce-8cb4-91a3ada32291.html
[53] https://www.wesh.com/article/marshall-major-taylor/26345488
[54] https://www.enterprisenews.com/news/20160129/local-motels-hotels-are-hotbeds-for-sex-trafficking
[55] https://www.tri-cityherald.com/news/local/crime/article208538224.html

5. In May 2018, 2 men coerced a 21 year-old woman to fly with them from California to the East Coast. Ultimately, the girl was sexually trafficked out of a Hampton Inn® in King of Prussia, Pennsylvania.[56]

6. In June 2013, a man was arraigned on charges of human trafficking after he forced a homeless women into prostitution at a Hampton Inn® in Tampa, Florida. The man choked the woman, slapped her in the face, and demanded that she look him in the eye and call him Daddy.[57]

b. HOMEWOOD SUITES®

i. Defendant Hilton owns, supervises, and/or operates the Homewood Suites® – Jacksonville South/St. John's Center located at 10434 Mid Town Parkway in Jacksonville, Florida.

ii. Hilton failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

iii. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hilton has repeatedly failed to stop these actions.

iv. Defendant Hilton may exercise control over Homewood Suites® hotels by:

7. distributing information to assist employees in identifying human trafficking;

8. providing a process for escalating human trafficking concerns within the organization;

9. requiring employees to attend training related to human trafficking;

10. providing new hire orientation on human rights and corporate responsibility;

---

[56] https://www.dailylocal.com/news/feds-indict-in-sex-trafficking-case/article_652194f5-807b-57ce-8cb4-91a3ada32291.html
[57] https://www.nbcmiami.com/news/local/Broward-Judge-Sets-30000-Bond-for-Man-Charged-With-Human-Trafficking-213598431.html

11. providing training and education to Homewood Suites® hotels through webinars, seminars, conferences, and online portals;

12. developing and holding ongoing training sessions on human trafficking; or

13. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v. Hilton was in an actual or apparent agency relationship with Homewood Suites® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Hilton's exercise of an ongoing and systemic right of control over Homewood Suites® hotels by Defendant Hilton's operations, including the means and methods of how Homewood Suites® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant Hilton's domain;

2. requiring Homewood Suites® hotels to use Defendant Hilton's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

35

12. other actions that deprive Homewood Suites® hotels of independence in business operations.

vi.    An actual and/or apparent agency also exists between Defendant Hilton and Homewood Suites® hotels. Defendant Hilton held out Homewood Suites® hotels to the public as possessing authority to act on its behalf.

vii.   Given Defendant Hilton's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Homewood Suites® hotels, Defendant Hilton breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii.    For years, Defendant Hilton has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Homewood Suites® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Homewood Suites® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Homewood Suites® hotels that forms the basis of this complaint.

    a.    In January 2017, 2 men trafficked a teenage girl at a Homewood Suites® in Philadelphia, Pennsylvania before she escaped and called 911.

    b.    In February 2017, 2 men were sentenced to more than a decade in federal prison for trafficking a 16-year old girl for sex at the Homewood Suites® in Bel Air, Maryland.[58]

    c.    In October of 2014, a prostituted woman was recovered from a Homewood Suites® in Orland Park, Illinois after her pimp was arrested.[59]

    d.    In March 2013, four victims were rescued from a sex trafficking operation at a Homewood Suites® in Bloomington, Minnesota. Two of the victims were underage girls. The victims were assaulted, drugged, raped, and manipulated emotionally and psychologically by their trafficker.  Their trafficker was arrested at the hotel and ultimately sentenced to 28 years in prison.[60]

    e.    In February 2016, 5 men and 2 women were arrested for trafficking Chinese women for sex at a Homewood Suites® in Rancho Cucamonga,

---

[58] https://patch.com/maryland/belair/sex-trafficker-busted-bel-air-sentenced-15-years-prison-u-s-attorney
[59] https://patch.com/illinois/orlandpark/cook-county-cops-collar-prostitute-sting-orland-park-hotel-police
[60] http://www.startribune.com/burnsville-man-gets-28-year-term-for-sex-ring-promoted-on-backpage-craigslist/199859361/

California.[61]

c. EMBASSY SUITES®

    i.    Defendant Hilton owns, supervises, and/or operates the Embassy Suites® – Jacksonville Baymeadows located at 9300 Baymeadows Road in Jacksonville, in Jacksonville, Florida.

    ii.    Hilton failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

    iii.    Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hilton has repeatedly failed to stop these actions.

    iv.    Defendant Hilton may exercise control over Embassy Suites® hotels by:

        1.    distributing information to assist employees in identifying human trafficking;

        2.    providing a process for escalating human trafficking concerns within the organization;

        3.    requiring employees to attend training related to human trafficking;

        4.    providing new hire orientation on human rights and corporate responsibility;

        5.    providing training and education to Embassy Suites® hotels through webinars, seminars, conferences, and online portals;

        6.    developing and holding ongoing training sessions on human trafficking; or

        7.    providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

---

[61] https://www.dailybulletin.com/2016/02/29/2-arrested-in-rancho-cucamonga-human-trafficking-operation/

v.   Hilton was in an actual or apparent agency relationship with Embassy Suites® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Hilton's exercise of an ongoing and systemic right of control over Homewood Suites® hotels by Defendant Hilton's operations, including the means and methods of how Embassy Suites® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant Hilton's domain;

2. requiring Embassy Suites® hotels to use Defendant Hilton's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Embassy Suites® hotels of independence in business operations.

vi.   An actual and/or apparent agency also exists between Defendant Hilton and Embassy Suites® hotels. Defendant Hilton held out Embassy Suites® hotels to the public as possessing authority to act on its behalf.

vii.   Given Defendant Hilton's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Embassy Suites® hotels, Defendant Hilton breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

a. For years, Defendant Hilton has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Embassy Suites® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Embassy Suites® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Embassy Suites® hotels that forms the basis of this complaint.

   i. In July 2017, a convicted felon was arrested for prostituting a woman at an Embassy Suites® in Birmingham, Alabama. The victim was repeatedly beaten by her trafficker when she tried to stop working for him. Over the course of several months, the man beat the victim with his fists, bit her on the face, struck her with

a handgun and pushed her down stairs. Physical violence and verbal threats were routinely used to force the woman to comply with his wishes, and to punish her when she did not.[62]

    ii.   In March 2011, a pimp was arrested at an Embassy Suites® in Lombard, Illinois for prostituting 3 women.[63]

59.   HYATT HOTELS CORPORATION ("HYATT")

    a.   HYATT REGENCY®

       i.   Defendant Hyatt owns, supervises, and/or operates the Hyatt Regency® – Jacksonville Riverfront located at 225 East Coastline Drive in Jacksonville, Florida.

      ii.   Hyatt failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

   iii.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hyatt has repeatedly failed to stop these actions.

   iv.   Defendant Hyatt may exercise control over Hyatt Regency® hotels by:

    1.   distributing information to assist employees in identifying human trafficking;

    2.   providing a process for escalating human trafficking concerns within the organization;

    3.   requiring employees to attend training related to human trafficking;

    4.   providing new hire orientation on human rights and corporate responsibility;

    5.   providing training and education to Hyatt Regency® hotels through webinars, seminars, conferences, and online portals;

    6.   developing and holding ongoing training sessions on human trafficking; or

---

[62] https://www.al.com/news/birmingham/2016/09/man_beat_bit_girlfriend_for_11.html
[63] https://www.dailyherald.com/article/20110317/news/703179820/

7. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v. Hyatt was in an actual or apparent agency relationship with Hyatt Regency® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Hyatt's exercise of an ongoing and systemic right of control over Hyatt Regency® hotels by Defendant Hyatt's operations, including the means and methods of how Hyatt Regency® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant Hyatt's domain;

2. requiring Hyatt Regency® hotels to use Defendant Hyatt's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Hyatt Regency® hotels of independence in business operations.

vi. An actual and/or apparent agency also exists between Defendant Hyatt and Hyatt Regency® hotels. Defendant Hyatt held out Hyatt Regency® hotels to the public as possessing authority to act on its behalf.

42

vii.   Given Defendant Hyatt's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Hyatt Regency® hotels, Defendant Hyatt breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii.   For years, Defendant Hyatt has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Hyatt Regency® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Hyatt Regency® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Hyatt Regency® hotels that forms the basis of this complaint.

43

      a.   From 2012-2017, the Hyatt Regency® in Houston, Texas was the site of 136 prostitution related arrests – the most of all hotels in the area.[64]

      b.   In April 2011, 2 men were arrested for trafficking four women for commercial sex out of a Hyatt Regency® in Greenwich, Connecticut.[65]

      c.   In September 2009, an investigation into a prostitution ring led law enforcement to the Hyatt Regency® in Phoenix, Arizona.[66]

60.   INTER-CONTINENTAL HOTELS CORPORATION ("IHG")

   a.   CROWNE PLAZA®

     i.   Defendant IHG owned, supervised, and/or operated the Crowne Plaza® – Jacksonville Riverfront located at 1201 River Place Boulevard in Jacksonville, Florida.

    ii.   IHG failed to implement and enforce any of its own policy or policies and protect Plaintiff C.K. from being sex trafficked.

   iii.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant IHG has repeatedly failed to stop these actions.

   iv.   Defendant IHG may exercise control over Crowne Plaza® hotels by:

     1.   distributing information to assist employees in identifying human trafficking;

     2.   providing a process for escalating human trafficking concerns within the organization;

     3.   requiring employees to attend training related to human trafficking;

     4.   providing new hire orientation on human rights and corporate responsibility;

     5.   providing training and education to Crowne Plaza® hotels through webinars, seminars, conferences, and online portals;

     6.   developing and holding ongoing training sessions on human trafficking; or

---

[64] https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php
[65] https://patch.com/connecticut/greenwich/prostitution-investigations-snag-13-area-residents
[66] https://www.bizjournals.com/phoenix/stories/2009/09/21/daily83.html

  7. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

 v. IHG was in an actual or apparent agency relationship with Crowne Plaza® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant IHG's exercise of an ongoing and systemic right of control over Crowne Plaza® hotels by Defendant IHG's operations, including the means and methods of how Crowne Plaza® hotels conducted daily business through one or more of the following actions:

  1. hosting online bookings on Defendant IHG's domain;

  2. requiring Crowne Plaza® hotels to use Defendant IHG's customer rewards program;

  3. setting employee wages;

  4. making employment decisions;

  5. advertising for employment;

  6. sharing profits;

  7. standardized training methods for employees;

  8. building and maintaining the facility in a manner specified by the owner;

  9. standardized or strict rules of operation;

  10. regular inspection of the facility and operation by owner;

  11. fixing prices; or

  12. other actions that deprive Crowne Plaza® hotels of independence in business operations.

 vi. An actual and/or apparent agency also exists between Defendant IHG and Crowne Plaza® hotels. Defendant IHG held out Crowne Plaza® hotels to the public as possessing authority to act on its behalf.

vii.   Given Defendant IHG's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Crowne Plaza® hotels, Defendant IHG breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii.   For years, Defendant IHG has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Crowne Plaza® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Crowne Plaza® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff C.K. at Crowne Plaza® hotels that forms the basis of this complaint. In recent years alone:

46

a. In April 2018, a man faced life in prison after trafficking a teenage girl at a Crowne Plaza® in Union City, California. [67]

b. In October 2017, a pimp was sentenced to 180 months in prison after undercover officers discovered that he was trafficking women out of a Crowne Plaza in Columbus, Ohio.[68]

c. In October 2017, an ad on www.backpage.com site led to a human trafficking investigation at the Crowne Plaza in Pittsburgh, Pennsylvania.[69]

### D. THE SEX TRAFFICKING OF C.K.

61. The facts alleged herein stem from a human trafficking and prostitution ring operated in Jacksonville, Florida. While victimized by her trafficker, C.K. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping and false imprisonment at the Defendants' hotels from 2008 through 2012.

62. In 2008, at 19 years old, C.K., a native of Westfield, Massachusetts, was living on her own in Jacksonville, Florida and working as a waitress. She had established a life for herself, she had a group of friends, a roommate and an apartment.

63. C.K. was at a social gathering when she met the 29-year-old man who would become her trafficker. The man befriended C.K. and offered her a part time job, answering the phones for a computer company, which she could use to supplement her waitressing income. C.K. agreed to meet the man in his room at the Homewood Suites® at 10434 Mid Town Parkway in Jacksonville, Florida. Immediately, a buyer showed up and C.K. suddenly found herself trapped in a hotel room with a stranger looking to

---

[67] https://www.eastbaytimes.com/2018/04/26/richmond-man-facing-life-for-allegedly-trafficking-teen-producing-child-pornography/
[68] https://abc6onyourside.com/news/local/pimp-sentenced-for-trafficking-women-in-columbus
[69] https://www.wtae.com/article/police-suspect-arrested-in-prostitution-sting-tried-to-disarm-two-officers-in-green-tree/13089018

exploit her. C.K. capitulated to the buyer.  As the stranger received oral sex coerced from C.K., her trafficker confiscated her wallet, keys, and phone.

64.    From 2008 through 2012, C.K. was required by her trafficker to have sex for payment with various buyers at the Defendants' hotels in response to advertisement for commercial sex that he had posted on www.backpage.com without her consent.[70]

65.    C.K. was kept at the Homewood Suites in Jacksonville, Florida for several days.  After that first day, C.K.'s trafficker had her servicing between five and seven men a day at that hotel. C.K.'s trafficker charged buyers $150 for a half hour with C.K. and $250 for a full hour.

66.    C.K.'s trafficker had a handful of other women that he was prostituting.  C.K. observed her trafficker control these other women by fostering their dependency on crack cocaine.

67.    C.K.'s trafficker treated her differently than the other women. Instead, C.K.'s trafficker only gave her crack cocaine sparingly as a special reward. Without chemical dependency as a mechanism of control, C.K's trafficker prohibited her from leaving the room unless he was escorting her.

68.    During her first month in her trafficker's custody at the Four Points® by Sheraton at 8520 Baymeadows Road in Jacksonville, Florida, C.K. was arrested for prostitution during an FBI sting at the hotel.  The FBI had been investigating the prostitution prone location. C.K. had been escorted to the location by her trafficker who waited in the distance. Later, C.K.'s trafficker paid her bond and told her that he now owned her.

69.    After C.K. had been arrested, her trafficker's behavior escalated. He became increasingly violent toward C.K. and deprived her of all of her earnings.

70. The physical assaults that C.K. suffered at the hands of her trafficker were constant and brutal. To avoid bruising her face or body, C.K.'s trafficker would slam her head into the nearest hard surface, be it the floor or a wall, whenever he determined that she had disobeyed him. If her trafficker was

---

[70]  Backpage.com was the leading online marketplace for commercial sex, until it was seized by the federal authorities in April 2018. Backpage.com operated in 97 countries and 943 locations worldwide—and was last valued at more than a half-billion dollars. See Backpage.com's Knowing Facilitation of Online Sex Trafficking, Staff Report, Permanent Subcommittee on Investigations, United States Senate (2018), https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf

particularly agitated, he would subject C.K. to his "terror squad" or "beast mode," a loud maelstrom of a non-stop assault that endured for hours at a time.

71.    C.K. was now servicing as many as 10 to 12 male buyers in a day. Each one entering the Defendants' hotels as a non-paying guest and leaving shortly thereafter. The foot traffic to the rooms where C.K.'s trafficker harbored her was constant and voluminous for the commercial sex alone. And C.K.'s trafficker also routinely engaged in drug transactions that brought more individuals calling upon the same rooms.

72.    Between 2008 and 2012, C.K.'s trafficker routinely harbored her at hotels throughout Jacksonville, including the Hampton Inn® at 4681 Lenoir Avenue S., the Embassy Suites at 9300 Baymeadows Road, the Howard Johnson® Inn and Suites at 4300 Salisbury Road, the Microtel® Inn & Suites by Wyndham at 4940 Mustang Road, and the Homewood Suites® at 10434 Mid Town Parkway. C.K. would be held in the rooms for weeks at a time servicing a constant stream of incoming buyers.

73.    C.K.'s trafficker stayed at these hotels over a long period of time, always renting the room for a number of weeks, paying in smaller increments, refusing housekeeping services and requesting an inordinate amount of towels.

74.    For weeks, C.K. was held captive in the room as she visibly deteriorated physically. Eventually, she would leave with her trafficker once the business slowed down or the location attracted too much police attention and the same pattern of behavior would continue at another of the Defendants' hotels.  C.K.'s trafficker often returned to each of the Defendants' hotels a number of times.

75.    C.K.'s trafficker also forced her to meet buyers for commercial sex (or "out calls") at the Defendants' hotels including, the Four Points® by Sheraton at 10605 Deerwood Park Boulevard, the Hyatt Regency® at 225 East Coastline Drive, and the Crown Plaza® at 1201 River Place Boulevard in Jacksonville, Florida.

76.    C.K.'s trafficker repeatedly operated out of the Howard Johnson® Inn and Suites at 4300 Salisbury Road, because he "felt so comfortable" there. At the Howard Johnson, C.K's trafficker engaged her in a particularly vicious "terror squad" where he repeatedly slammed C.K. across the room,

smashed a coffee pot over her head and then continued hitting her with the broken shards. The hotel room was scattered with broken furniture, metal, and glass, as well as C.K.'s blood. C.K.'s trafficker then required her to stand for twelve (12) hours straight in the bathroom as further punishment.

77.    Afterwards, C.K.'s trafficker still forced her to service buyers. Limping, and visibly bruised across her face, arms, and legs, C.K. walked through the Crowne Plaza® at 1201 River Place Boulevard, as she had done many times before. She had no luggage or I.D. and her trafficker lingered in her shadow. The front desk staff at the Crowne Plaza® saw a bruised and battered woman going to see a hotel guest for a few hours, as the man who escorted her waited around the hotel common areas and they took no action.

78.    Between 2008 and 2012, the same scene repeatedly played out at the Crowne Plaza® at 1201 River Place Boulevard, the Four Points® by Sheraton located at 10605 Deerwood Park Boulevard and the Hyatt Regency® at 225 E Coastline Drive. C.K. served upon regular and repeated clients at each hotel, passing the front desk visibly beaten and neglected. Each time visibly deteriorating a little more.

79.    On several occasions, C.K.'s trafficker injured her so badly that customers refused to have sex with her.

80.    C.K. tried to escape her trafficker numerous times. She finally escaped in early 2012 after a regular buyer observed the physical effects of a particular brutal beating and left her a $500 tip with the words "go sooner than later." After her trafficker fell asleep in his car, C.K. called a cab to the airport and jumped on a plane.

81.    The FBI ended up investigating C.K.'s trafficker and he was later prosecuted by the United States Attorney's Office for the Southern District of Florida.  On May 1, 2014, C.K.'s trafficker was sentenced to 24 years in federal prison for sex trafficking by force, fraud, or coercion. He was indicted on June 27, 2012 and pleaded guilty in November 2013.

82.    Prior to, during and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including,

but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

83.    Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of C.K.

### E.   THE DEFENDANTS FACILITATED THE TRAFFICKING OF C.K.

84.    Defendants Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation profited from the sex trafficking of C.K. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to C.K.'s trafficker for weeks at a time, when they knew, or should have known, that he was using their room to imprison C.K., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

85.    Defendants Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation knew, or should have known, that C.K. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because C.K.'s trafficker frequented the Defendants' hotels.

86.    Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation knew, or should have known, that C.K. was being trafficked because C.K.'s trafficker paid for his room using cash, reserved his room for an extended stay, refused all housekeeping services but frequently requested towels, constantly entertained traffic from 5-12 male visitors a day, and checked in with a young woman who seldom left the room;  behavior that indicated he was using the Defendants' hotels for his illegal sex trafficking venture.

87.    Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation, actively participated in this

illegal endeavor by knowingly providing lodging to C.K.'s trafficker in which to harbor C.K. while he was trafficking her.

88.    Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation profited from the sex trafficking of C.K. and knowingly aided and participated with C.K.'s trafficker in his criminal venture. The Defendants took no action as C.K. repeatedly visited the hotel, often visiting the same guests, without any luggage, avoiding all eye contact, and exhibiting signs of diminished personal hygiene, sleep deprivation, malnourishment, and often displaying prominent bruising all over her person.

89.    Defendants Wyndham Hotels and Resorts, Inc., Hilton Worldwide Holdings, Inc., Marriott International, Inc., Inter-Continental Hotels Corporation, and Hyatt Hotels Corporation, actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from C.K. in which to harbor C.K. while she was being trafficked.

90.    The Defendants all had the opportunity to stop C.K.'s trafficker and offenders like him from victimizing C.K. and others like her.  Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

91.    The Defendants all financially benefited from the sex trafficking of C.K., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

92.    The Defendants all enjoy the steady stream of income that sex traffickers bring to their budget level hotel brands, such as Microtel®, Howard Johnson®, Hampton Inn®, Homewood Suites®, and Embassy Suites®.

93.    The Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

94.    The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

95.    The Defendants maintained their deficiencies to maximize profits by:

      a.      Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

      b.      Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

      c.      Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

96.    As a direct and proximate result of these egregious practices on the part of the Defendants, C.K. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**

**A.   COUNT ONE – 18 U.S.C §1595 ("TVPRA")**

97.    The Plaintiff C.K. incorporates each foregoing allegation.

98.    C.K. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

99.    The Defendants acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of C.K. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and/or commissions.

100.   The Defendants have financially benefited as a result of these acts, omissions, and commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendants directly benefitted

from the trafficking of C.K. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of C.K.'s injuries and damages.

101. C.K. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591 (a).

## **PRAYER FOR RELIEF**

WHEREFORE on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

c. past and future lost wages and loss of earning capacity;

d. past and future emotional distress;

e. consequential and/or special damages;

f. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g. punitive damages with respect to each cause of action;

h. reasonable and recoverable attorneys' fees;

i. costs of this action; and

j. pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

### THE PLAINTIFF DEMANDS A TRIAL BY JURY

Dated this 9th day of December, 2019.

RESPECTFULLY SUBMITTED,

*/s/T. Michael Morgan*
T. Michael Morgan
FBN: 0062229
Morgan & Morgan, PA
20 N Orange Ave
Orlando, FL 32801
Telephone: (407) 418-2031
Facsimile: (407) 245-3384
Primary E-Mail: mmorgan@forthepeople.com
Secondary E-Mail: plarue@forthepeople.com
*Attorney for the Plaintiff*

Ashley B. Landers
KBN: 98399
**Pending Pro Hac Vice**
Morgan & Morgan, PA
333 W Vine St, Suite 1200
Lexington, KY 40507
Telephone: (859) 873-7406
Facsimile: (859) 899-8805
Primary E-Mail: alanders@forthepeople.com
*Attorney for the Plaintiff*